[Civ. No. 3198.   Third Appellate District—February 14, 1927.]

THE NATIONAL BANK OF NEW ZEALAND, LTD., Respondent, v. THOMAS F. FINN, as Sheriff, etc., Appellant.

[1] ATTACHMENT—SHIPMENT OF COPRA—PROCEEDS FROM SALE REPRESENTED BY CHECK OR BILL OF EXCHANGE — OWNERSHIP OF CHECK IN FOREIGN BANK—DELIVERY OF CHECK TO SHERIFF—EFFECT UPON TITLE.—The act of a garnishee (a local bank), which had been instructed by a foreign bank to collect for the latter's account the proceeds from a shipment of copra made by a customer of said foreign bank, in delivering a check or bill of exchange representing said proceeds into the custody of the sheriff in attachment proceedings by a factor (who sold the copra) against said customer of the foreign bank, without the direction of the foreign bank so to do by the local bank, did not convert the ownership of the foreign bank and its right of possession to the check or bill of exchange, and the proceeds, thereof, into property belonging to the customer.

[2] ID.—DELIVERY OF BILL OF LADING, ETC., TO FACTOR—EFFECT UPON BANK'S LIEN.—The fact that such foreign bank surrendered the bill of lading and other papers relating to the shipment of copra to the factor for the purpose of making sale thereof did not affect the lien of the bank upon the cargo, or its rights to the proceeds arising from sale thereof.

[3] AGENCY—RELATION OF PRINCIPAL AND FACTOR — FIDUCIARY CHARACTER OF — ACCOUNTING. — The relation of principal and factor is of a fiduciary character and carries with it the elements of a trust requiring the factor to scrupulously account to its principal.

[4] ID. — STATUS OF FACTOR — ADVERSE CLAIMS.—A factor is both a bailee and a sales agent and is bound by his contract with his

———————

3.  Definition of "factor" and status, note, 58 **Am. Dec.** 158.  See, also, 11 **R. C. L.** 753; 12 **Cal. Jur.** 411.

4.  See 11 **R. C. L.** 757.

principal, and he cannot set up an adverse claim to the property or to its proceeds as against his principal.

[5] ID.—REMEDIES OF PRINCIPAL — NOTICE. — The principal can follow the funds or property delivered to a factor to sell as against anyone having notice.

[6] ATTACHMENT — DISPOSITION OF PROCEEDS — AGREEMENT BETWEEN FACTOR AND BANK — INEFFECTUAL GARNISHMENT BY FACTOR. — The attachment by the factor of such check or bill of exchange while in the hands of the local bank was ineffectual, where the sale of the copra was made by the factor recognizing the title of the foreign bank, and under an agreement to turn over the proceeds to the foreign bank's agent, the local bank.

[7] ID.—CONVERSION OF CHECK—DISCOUNTING OF DRAFT—EVIDENCE.— In this action by a foreign bank against the sheriff for conversion of the check or bill of exchange which was levied upon in the attachment proceedings commenced by the factor, the record discloses sufficient testimony to warrant the holding that the foreign bank discounted the draft drawn by its customer in connection with the shipment of copra, and the fact that it was sent by said foreign bank to its agent, the local bank, for collection does not contravene the statement that the draft was discounted.

[8] ID.—THIRD-PARTY CLAIM—ACTION THEREON BY SHERIFF—ESTOPPEL —INTERVENTION—PARTIES.—In such conversion action, the third-party claim of the foreign bank served on the sheriff in the attachment proceedings commenced by the factor having been sufficient to entitle the sheriff to act thereon, and having acted thereon and obtained an indemnity bond, the urging on appeal of the insufficiency of the claim as a defense is precluded; and the fact that the third party may intervene in the original action is in no sense a bar to the maintenance by such third party of an action for conversion; nor do the provisions of section 710½ to and including 713½ of the Code of Civil Procedure estop the plaintiff in this action from maintaining an action sounding in trover.

[9] ID.—SERVICE OF THIRD-PARTY CLAIM—PLEADING.—In such conversion action, the contention that the complaint did not sufficiently allege the service of a third-party claim is untenable, where it is sufficient to set forth the instrument according to the legal tenor or effect thereof, and the defendant set forth the instrument *in haec verba*, stating this was the kind of notice and claim served upon him; and having supplied the alleged insufficiency in the complaint, no cause of objection exists.

[10] ID.—CONVERSION—TITLE—PARTIES—AGENCY.—In such conversion action, as the local bank was the agent of the foreign bank in

5.  See 11 R. C. L. 786.

the transactions involved, the latter bank, as the principal having a general ownership in the proceeds of the sale of the copra, was entitled to maintain the instant action of conversion; and the form in which such proceeds were evidenced was immaterial as to the ownership and ultimate right of possession.

[11] ID.—DELIVERY OF CHECK TO SHERIFF—CONTRAVENTION OF OWNER'S RIGHTS — CONVERSION — PARTIES. — In such conversion action, the placing by the local bank of the check or bill of exchange evidencing the proceeds arising from the sale of the copra in the possession of the defendant having been in contravention of the rights of the foreign bank, this gave rise to an immediate cause of action on the part of the foreign bank.

(1) 28 C. J., p. 303, n. 51, 55, p. 304, n. 61; 37 C. J., p. 337, n. 62, p. 340, n. 33; 36 Cyc., p. 219, n. 26 New. (2) 25 C. J., p. 372, n. 75, p. 416, n. 57; 36 Cyc., p. 219, n. 26 New. (3) 25 C. J., p. 342, n. 32, p. 371, n. 42. (4) 25 C. J., p. 371, n. 42, p. 378, n. 85, 88. (5) 25 C. J., p. 371, n. 52, p. 416, n. 57. (6) 36 Cyc., p. 219, n. 26 New. (7) 7 C. J., p. 597, n. 32, p. 598, n. 33. (8) 28 C. J., p. 372, n. 70; 35 Cyc., p. 1794, n. 39 New, p. 1795, n. 57 New. (9) 31 Cyc., p. 715, n. 57; 35 Cyc., p. 1811, n. 28 New. (10) 30 Cyc., p. 1207, n. 96; 35 Cyc., p. 1789, n. 49 New; 38 Cyc., p. 2044, n. 57, p. 2046, n. 61, p. 2047, n. 62, 63. (11) 38 Cyc., p. 2064, n. 84.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Walter Perry Johnson, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. S. Andrews and A. E. Shaw for Appellant.

Gavin McNab, Nat Schmulowitz and A. D. Duncan for Respondent.

PLUMMER, J.—Action by plaintiff for the value of a certain check alleged to have been converted by the defendant. Plaintiff had judgment in the sum of $17,884.48, from which judgment the defendant appeals.

In September, 1920, the plaintiff was a national bank organized and existing under an act of the general assembly of New Zealand and will hereafter be referred to as the "New Zealand Bank." At the same time and prior thereto, John Burns & Co., Ltd., was a corporation organized and existing under a general act, of the same assembly and will

hereafter be known as "Burns." At the same time, the Fiji Planters Co-operative Association, Ltd., of Savu Savu, Fiji Islands, were planters and shippers of copra, and will hereafter be referred to as the "Fiji Planters." During the same period of time the firm of Geo. Wills & Sons, Ltd., was a corporation maintained under the laws of the United Kingdom of Great Britain and Ireland, doing business at San Francisco, California, and will hereafter be known as "Wills."

In September, 1920, the Fiji Planters offered Burns a shipment of copra; Burns arranged through Wills to charter a vessel in San Francisco to load the copra and Wills chartered the schooner "Narwhal." Burns accepted the offer of the Fiji Planters and opened a letter of credit in favor of the Fiji Planters with the New Zealand Bank for £20,000 to cover the cargo of copra. The copra was to be shipped to Wills and Wills was to resell the copra. Burns advised Wills to sell the copra. On October 12, 1920, Wills, in his own name, entered into a contract with John Rothchild and Company of San Francisco for the sale of the copra to the latter at seven and one-half cents per pound. The contract was made for shipment of the copra in October, November and December, 1920. The copra was not shipped until the early part of January, 1921. The contract provided for payment as follows: Net cash against seller's sight draft with attached documents, consisting of bill of lading, invoices, etc. Thus, no one could get title or possession of the copra other than the owner and holder of the sight draft until the draft should be paid. Rothchild neither paid the draft nor received the goods. The cargo was rejected by Rothchild on the ground that the shipment was not made at the time limited in the contract. When the copra arrived in San Francisco in 1921, the price had declined so that when the copra was finally disposed of it only brought gross three and one-half cents a pound. Burns was an old and large customer of the New Zealand Bank and was at the times mentioned indebted to the bank in the sum of £200,000. On February 1, 1921, Burns delivered to the New Zealand Bank a general letter of hypothecation, the latter clause of which reads: "This letter shall not affect or detract from the bank's general lien according to the law of banker and customer, over all property or any securities in your custody

not specifically charged by this letter belonging to us." This general letter of hypothecation authorized the bank to take possession and to proceed at once and without notice to sell at its absolute discretion, and in such manner and at such times as should be thought fit, all or any part of the goods represented by any shipping documents held by the bank, and apply the net proceeds thereof, in payment of all bills, etc., and in liquidation of any debts or liabilities of Burns to the New Zealand Bank. The bank was handed by Burns the bill of lading, invoices, and insurance policies. On February 7 the New Zealand Bank credited the general account of Burns with £20,000 to meet the draft Burns was paying on account of the Fiji Planters. The account of Burns was thus credited with the full amount of the draft of Burns on Wills, drawn by Burns on account of the shipment of copra. The course of business between Burns and the New Zealand Bank was such that if a bill was drawn in connection with the sale of goods, and documents accompanied the bill of exchange and the New Zealand Bank discounted the same or made an allowance on the same, an invoice, bill of lading and insurance policy invariably accompanied the bill of exchange. The bill of lading was indorsed: "John Burns & Company, Limited, Robt. Burns, Managing Director, as agents of the Fiji Planters Cooperative Association, Limited." This was a general indorsement according to custom so that the bill of lading could be negotiated by delivery.

The New Zealand Bank sent to the Canadian Bank of San Francisco for "collection and credit" through the London office of the New Zealand Bank the draft for £20,000 drawn by Burns on Wills, which it had obtained as herein stated. On March 24, 1921, the Canadian Bank received the letter from the New Zealand Bank inclosing draft, the invoices, custom certificates, insurance policy, and bill of lading for the copra, accompanied by the following letter: "Auckland 9th February, 1921. For favour of collection and credit through our London office I enclose herewith our remittance:—BB 777 John Burns & Co. Ltd. £20,000 at sight, dated 8th February, 1921. The draft is supported by invoice, custom certificate, insurance policy for £50,000 and bill of lading for 589 tons 12 cwt. of copra per Barq Narwhal. £50,000 the balance of insurance is covered by consignee's instructions:—Second of exchange will reach you

by later mail, together with duplicate documents. Kindly advise date of payment direct to this office and to our London office.'' The ''Narwhal'' reached San Francisco April 14, 1921. Rothchild inspected the captain's log-book, found the date of loading, rejected the cargo and refused to pay therefor. This led to considerable correspondence by cable and otherwise between the Bank of New Zealand, the Canadian Bank, the Canadian Bank with Wills, relative to the sale of the copra. Wills also cabled Burns.

So far as pertinent, the cablegrams and letters are as follows: On April 20, 1921, the Canadian Bank to which all the papers relating to the cargo had been forwarded by the New Zealand Bank cabled the New Zealand Bank as follows: ''Your 777 drawee states documents should be surrendered unconditionally as buyers reject cargo. Wills says cannot act unless given free hand. Instruct.'' At the same time Wills cabled Burns: ''Bank will only release on impossible conditions. Imperative you should arrange surrender of documents unconditionally immediately. Otherwise we cannot proceed in accordance with contract.'' On April 20th Burns cabled Wills: ''What unreasonable guarantee do bank want? We have asked Miller to see you. Give him full particulars.'' On April 22d the New Zealand Bank cabled the Canadian Bank as follows: ''Do not surrender documents unconditionally. Burns instructs Wills must give a guarantee that all proceeds copra up to £20,000 sterling handed over to you towards the payment of draft.'' On April 22d, Wills cabled Burns again: ''Bank demand guarantee payment total proceeds twenty thousand pounds. Cannot agree to. We are prepared to pay them proceeds after deducting all charges and expenses.'' On April 22d Mr. Mitchell for the Canadian Bank wrote Wills as follows: ''San Francisco, Cal. April 23d, 1921. (Should be April 22nd, 1921.) Re. Draft Burns & Co., on Yourselves £20,000. Referring to the draft we have received from the National Bank of New Zealand, Ltd. Auckland, for £20,000 against shipping documents per 'Narwhal' we beg to advise that we have to-day received the following cable in regard thereto: 'Our 777 do not surrender documents unconditionally. Burns instructs Wills must give a guarantee, that all proceeds copra up to £20,000 sterling handed over to you towards the payment draft Burns have telegraphed G. J.

Miller · to watch their interests. Will probably interview you.' In this connection we understand that you will give us a guarantee to hand us the proceeds of the copra less freight, commission, insurance, arbitration fees and allowances, which may be made by the arbitration, legal and handling charges, and we would be obliged if you would kindly confirm this understanding in order that we can submit it to the National Bank of New Zealand, Ltd., Auckland, by cable.'' On the same day, Wills wrote the Canadian Bank, in reply thereto, the following letter: "We have to acknowledge your letter of to-day's date, which advises us of the cable you have received from the National Bank of New Zealand, Ltd., Auckland, in connection with the draft on the cargo of copra per the 'Narwhal.' As advised you on the telephone, we cannot agree to the stipulation made by the National Bank of New Zealand, Ltd., whereby we guarantee to remit you the proceeds for the copra of £20,000. Mr. G. J. Miller has called on us and we have explained the situation to him thoroughly in the same manner as we have done with your good selves, and we beg to advise you that we are ready to comply with the last paragraph of your letter, to give you a guarantee to hand you the proceeds of the copra less charges as set forth in yours under reply. As you will readily understand, any expenses in connection with the cargo of the 'Narwhal' must be for account of Messrs. John Burns & Co., Ltd.'' Following which the Canadian Bank on April 26th wrote Wills as follows: "Referring to our letter of 23rd April and yours dated 22nd April, re draft of John Burns & Company, Ltd., on your good selves for £20,000, we beg to hand you herewith shipping documents covering cargo of copra in bulk, per Schooner 'Narwhal' and in consideration thereof would you be good enough to give us a guarantee to hand us the proceeds of this copra less freight, commission, insurance, arbitration fees and allowances, legal and handling charges.'' On April 27, 1921, Wills replied as follows: "In reply to yours of even date, we have to acknowledge receipt of the documents for the cargo of copra in bulk per the Schooner 'Narwhal' and we hereby guarantee to hand you the proceeds of the sale of this copra, less freight, commissions, insurance, arbitration fees and allowances, legal and handling charges,'' in connection with the cargo sent Wills, etc.

All the documents relating to the cargo were thus placed in the hands of Wills authorizing him to proceed with the sale thereof by the plaintiffs and turn over the proceeds to the Canadian Bank for the benefit of plaintiffs. Wills proceeded with the sale, paid all the bills, expenses, charges, commissions, etc., and rendered a statement to the Canadian Bank thereof showing the net proceeds of the cargo to be the sum of $17,888.48, and at the same time delivered to the Canadian Bank a check or bill of exchange in the following words: "Voucher No. ———. In full settlement of undermentioned bills. Proceeds from 'Norwhal' copra Due John Burns Co., Ltd. Net 17888.48 George Wills & Sons, Limited, 230 California Street, San Francisco, California. Aug. 16, 1922. Pay to the order of Canadian Bank of Commerce—$17,888.48 (seventeen thousand eight hundred eighty-eight dollars forty-eight) For George Wills & Sons, Limited, A. H. Anderson. To the British American Bank, 11–3 San Francisco, Calif. John Baxter." Immediately thereafter the defendant in this action, as sheriff of the city and county of San Francisco, under a writ of attachment, issued in an action begun by Wills against Burns, served upon the Canadian Bank a notice of garnishment, under and by which the defendant purported to garnishee all moneys and credits in the hands, or under the control of the Canadian Bank belonging to Burns. To this notice of garnishment the Canadian Bank made reply that it had no funds or credits belonging to Burns. Thereafter the check herein referred to was accepted by the British American Bank, but never cashed by the Canadian Bank or credit therefor given to the plaintiff, the New Zealand Bank. Thereafter, and on or about the twenty-first day of November, 1922, the New Zealand Bank served a notice upon and filed with the defendant a third-party claim, notifying the defendant that the plaintiff, the New Zealand Bank, claimed the check and the proceeds represented thereby. Subsequently the check referred to was indorsed by the Canadian Bank, and on or about the twenty-eighth day of December, 1922, delivered to the custody of the sheriff, accompanied by a letter of that date referring to the garnishment served upon the Canadian Bank on the sixteenth day of August, 1922, and among other things stated: "That the Canadian Bank of Commerce received the said check and the funds represented by said check for the

account of the National Bank of New Zealand, Ltd., and for
your information you are advised that the National Bank of
New Zealand, Ltd., claims to be the owner of and entitled
to the possession of the said check and the funds represented
by said check.   The Canadian Bank of Commerce does not
care to assume the responsibility of determining who is the
owner of the said check or who is entitled to the proceeds
represented by said check, and it is therefore accordingly
placing the said check in your possession and under your
control, pursuant to the levy of the writ above mentioned,
but with the express reservation and understanding that in
so doing the Canadian Bank of Commerce of San Francisco
refuses to recognize that the said check and the funds repre-
sented thereby, or any part thereof, belong to John Burns
& Company, Limited.''   The third-party claim of the plain-
tiff was again served upon the defendant and the defendant
required of and obtained of Wills an indemnity bond.   Wills
having obtained judgment against Burns, took out an execu-
tion, acting under which, the check referred to was cashed
and the money represented thereby turned over to Wills on
account of its judgment against Burns.

Thereupon this action was begun by the plaintiff against
the defendant for the conversion of said check and for the
recovery of the sum of $17,888.48, the value thereof.

The trial court found that on the sixteenth day of August,
1922, the check or bill of exchange was delivered to the
Canadian Bank of Commerce by the drawer thereof for the
account of the National Bank of New Zealand and that the
plaintiff was the person beneficially interested in said check
and entitled to the moneys represented thereby and that the
British American Bank on that date stamped upon the face
of said check or bill of exchange its certificate of acceptance,
that the check was not voluntarily delivered by the Canadian
Bank to the sheriff, but was delivered to the sheriff in pur-
suance of the garnishment, and that the defendant was
notified that the check and the funds represented thereby
belonged to the New Zealand Bank.   The trial court also
found that the defendant wrongfully converted said check
and likewise wrongfully applied the proceeds thereof in
satisfaction of the judgment held by Wills against Burns.
The court further found that while the bill of exchange was
made payable to the Canadian Bank, the Canadian Bank

represented the Bank of New Zealand for the purpose of collecting the check and the proceeds represented thereby; that the Bank of New Zealand was the owner of said bill of exchange and the only one entitled to receive the proceeds. The court further found that the defendant wrongfully refused to deliver said personal property or the proceeds thereof to the plaintiff, and, as a conclusion of law, the court determined from the facts found that the plaintiff was entitled to judgment in the sum prayed for, and judgment was entered for the plaintiff in the sum hereinabove mentioned.

Upon this appeal the defendant sets forth nine distinct allegations of error upon the part of the trial court, on every one of which defendant insists the judgment of the trial court should be reversed: 1. When the Canadian Bank delivered the indorsed check to the sheriff, respondent irrevocably lost any lien or title it had to the check or bill of exchange; 2. That when respondent surrendered the bill of lading and other papers relative to the shipment of the cargo of copra to Wills, it lost its lien, if any, upon the copra and the proceeds to be derived therefrom; 3. That if respondent retained any lien when the bill of lading was delivered to Wills, it was lost when Wills sold the copra to the El Dorado Oil Works; 4. That the draft on Wills was taken for collection only and was not discounted by the New Zealand Bank; 5. That no third-party claim was served upon the appellant after his reception of the indorsed check; 6. That the third-party claim served by respondent did not comply with section 689 of the Code of Civil Procedure; 7. That the plaintiff's complaint does not allege service of third-party claim and, therefore, fails to state a cause of action; 8. That the findings are insufficient to support the judgment; 9. And that plaintiff had no title to the check nor right to possession thereof and cannot maintain this action of trover.

[1] We will consider these assignments of error in the order above set forth. By reference to the letter dated December 28, 1922, it will be noticed that the Canadian Bank of Commerce did not surrender the check as the property of Burns, nor without giving to the defendant notification of the fact that it had not received said check as the property of Burns. There is nothing in the transcript which indicates that the New Zealand Bank authorized the Canadian Bank

to deliver the check or bill of exchange to the defendant. The transcript does show that the same attorneys acted for the Canadian Bank who appeared in behalf of the plaintiff in this action. Whatever action the Canadian Bank may have taken with relation to the check, its liability, if any, is fixed by the garnishment. As stated in *Marshall* v. *Wentz,* 28 Cal. App. 540 [153 Pac. 244] : "The liability of the garnishee is fixed by the service upon him and as of the date of the service and continues until the discharge of the attachment or the satisfaction of the judgment." Section 544 of the Code of Civil Procedure provides that in all cases where the garnishment is served upon any person whose property or credits are alleged to belong to the debtor named in the action, said party shall be liable to the plaintiff for the amount of such credits, etc., unless the same be delivered to the sheriff. The fact of whether the garnishee properly or improperly delivers property or credits alleged to belong to the judgment debtor does not, in any manner, affect the right or title of the true owner of the property or credits in the event that the garnishee has mistaken the true ownership, but the statute does provide for notifying the sheriff of the true ownership of the property or credits by a third party considering himself the owner thereof and the one ultimately entitled thereto, or to the proceeds thereof. It may be otherwise stated in this language: That the action of the garnishee in replying that he has no property or credits belonging to the debtor named in the attachment action or not delivering property under garnishment process to the sheriff has no determinative effect upon the title or ownership of the property or credits denied to be held, admitted to be held or delivered to the sheriff. In 37 C. J., page 336, section 57, it is said: "As a general rule a common-law or other lien dependent upon possession is waived or lost by a lienholder voluntarily and unconditionally parting with possession or control of the property to which it attaches; and such lien cannot be restored thereafter by resumption of possession. But the lien is not waived or destroyed, except as to third parties, where there is an intention to preserve the lien, the lienholder only conditionally parting with the property, as where by special agreement he allows the owner to take the property into his possession without prejudice to the lien, or where he delivers it to an agent, servant,

or trustee to hold for his benefit and subject to his lien. Nor is the lien lost where the property is taken from his possession without his consent by force or fraud, and where the property is taken from him involuntarily, as by a replevin suit, he may upon regaining possession sue to foreclose the lien. Where possession is not essential to the existence of the lien, the general rule does not apply." In section 393, Bowers on the Law of Conversion, the text-writer thus states the rule: "The pledgee has a special property or interest in the chattel pledged, entitling him to the possession of it until the obligation secured is satisfied, not only as against the pledgor, but as against all the world—except the true owner in case the pledge has been wrongfully made. He is consequently entitled to maintain any action for the protection of his possession and special interest, not only against the pledgor—if he wrongfully retains possession—but against third persons who interfere with the same without right. Thus, where a third person, without authority, secured the property and returned it to the pledgor, he was held liable to the pledgee in trover. And the same liability was imposed upon an officer who took the property under an attachment even though the writ was regular on its face," citing a number of authorities. In the case of *Einstein* v. *Dunn,* 61 App. Div. 195 [70 N. Y. Supp. 520], subsequently affirmed by the court of appeals, it was held: "Where plaintiff acquired title to property stored in a warehouse by a transfer of the warehouse receipt and the issuance of a new one in his name, the delivery of the goods by the warehouseman to the sheriff on replevin process will not defeat a recovery against the sheriff for conversion, as a voluntary surrender by plaintiff, as the surrender was made by the warehouseman knowing and acknowledging plaintiff's right." In the case at bar the delivery of the check or bill of exchange was made to the sheriff, not only with the knowledge brought home to the sheriff, but under the express statement and explicit declaration that the check and the proceeds thereof belonged to the plaintiff in this action. The case of *Finch* v. *Finch,* 12 Cal. App. 274 [107 Pac. 594], decided by this court, does not present circumstances identical with those which we are considering, and hence is not in point. In that case the garnishee following a refusal to disclose to the sheriff property in his possession upon a prior garnish-

ment, subsequently turned over to the sheriff under an execution later in date and subsequent in right, property in his possession belonging to the judgment debtor, which property was applied in satisfaction of the latter judgment, and it was held that the garnishee could not relieve himself from liability in any such manner, nor could the garnishee make his election as to the creditor whom he would favor by his reply to the garnishment. Nor do the cases of *Latta* v. *Tutton*, 122 Cal. 279 [68 Am. St. Rep. 30, 54 Pac. 844], and *Gault* v. *Wiens*, 32 Cal. App. 1 [161 Pac. 996], bear upon the questions decisive of the issues at bar. In the Latta case the substance of the decision is to the effect that a pledgee of property surrendering the same cannot acquire title thereto based upon a void judicial sale; and, in the Gault case, it was held that where a bank holding notes as collateral security surrendered them to the sheriff to be sold on execution to satisfy a judgment obtained against the pledgor, its lien as pledgee on such notes was thereby lost, and that the purchaser of such notes at the execution sale, acquired only the right, title, and interest of the pledgor and took the same subject to all equities which might have been pleaded in an action thereon brought by the pledgor.

The record which we have heretofore cited amply entitled the trial court to find that the Canadian Bank, in surrendering the check or bill of exchange to the sheriff, was acting in its own behalf, and not in the scope of its agency for the New Zealand Bank, irrespective of whether the Canadian Bank did or did not act voluntarily. That the action of the Canadian Bank, whether voluntary or involuntary, in this particular, or whether acting without or under compulsion of order of court is outside the issues to be decided in this case and does not affect plaintiff's title appears, when the rule set forth in 28 C. J., page 303, section 455, is applied, to wit: "The garnishee being a mere stakeholder, it is well settled that he may relieve himself of liability by payment of the amount owing by him, or delivery of the property of defendant in his possession, to the officer serving the writ. But the garnishee is not compelled to make such payment or delivery, this being a matter of privilege with him. However, under some statutes the court may require the garnishee to turn over to the court, or to the sheriff or like officer . . . An order of court for a garnishee to pay money

attached into court decides nothing with regard to the right of claimants to the money.'' And, as stated in section 64, 37 C. J., page 340: ''Where a lienor is wrongfully deprived of or disturbed in the possession of the property, he may maintain trover and conversion for its value.'' In this particular we may call attention to the findings of the court that the Canadian Bank of Commerce indorsed the check or bill of exchange at the suggestion and request of the defendant and delivered said check or bill of exchange into possession and under the control of the defendant pursuant to the levy, notice of attachment, etc. As a summary of the law relative to appellant's first alleged error, it may be stated that the act of the Canadian Bank delivering the bill of exchange or check into the custody of the sheriff, without the direction so to do by the New Zealand Bank could not convert the ownership of the New Zealand Bank and its right of possession to the bill of exchange, and the proceeds thereof, into property belonging to Burns. This being true, whether the Canadian Bank should have proceeded according to the sections of the Code of Civil Procedure relating to the determination of conflicting claims, or, as said in volume 4, section 132, California Jurisprudence, page 249, becomes wholly immaterial, as the liability or nonliability of the Canadian Bank does not affect the rights of any of the other parties to this action.

[2] Did the surrender of the bill of lading and other paper relating to the shipment of copra to Wills for the purpose of making sale thereof affect the lien of the plaintiff upon the cargo, or its rights to the proceeds arising from the sale thereof? Section 2026 to 2030 of the Civil Code fixes the powers and liabilities of Wills as a factor in this case. It is there provided that a factor must obey the instructions of his principal. In this case the principal was the New Zealand Bank, acting through its agent, the Canadian Bank of San Francisco. It is the duty of the factor to sell the goods and account to his principal for the proceeds, and under section 2369 of the Civil Code, the factor has the ostensible authority to deal with the property of his principal as his own, in making sale of the property for the principal. We have thus a case of the delivery of the bill of lading and other writings authorizing the sale of the cargo of copra by a factor and not by the pledgor of the cargo. Even had

the redelivery been made to the pledgor, it does not necessarily follow that the lien of the pledgee, if any, would thereby be extinguished. In *Palmtag* v. *Doutrick,* 59 Cal. 154 [43 Am. Rep. 245], it is said, quoting from the opinion on page 159: "As a general rule, it is, no doubt, true that the delivery back of the possession of the thing pledged with the consent of the pledgee terminates the bailment and his lien. (*Holmes* v. *Crane,* 2 Pick. (Mass.) 607; *Jarvis* v. *Rodgers,* 15 Mass. 389; *Treadwell* v. *Davis,* 34 Cal. 601 [94 Am. Dec. 770].) But if the pledgor recover possession of the pledged property wrongfully without the consent of the pledgee, the pledge is still valid. (*Walcott* v. *Keith,* 2 Fost. (N. H.) 196.) And if it is delivered back to the pledgor in a new character, as a special bailee or agent, the pledgee will still be entitled to the pledge, not only against the owner but against third persons, for under such circumstances the possession is perfectly consistent with the existence of the original right of the pledgee. (*Macomber* v. *Parker,* 14 Pick. (Mass.) 497; *Reeves* v. *Capper,* 5 Bing. (N. C.) 140, 141; *Hayes* v. *Riddle,* 1 Sand. Sup. Ct. (N. Y.) 252.)" The holding in the Palmtag case was that the lien had not been lost.

Again, as said in 25 C. J., section 149, page 416: "As in other agencies, the factor holds the goods of his principal and their proceeds when sold in the character of a trustee, and in the absence of statutes which furnish protection to persons dealing with factors, if the factor wrongfully disposes of the goods or proceeds, the principal may follow and recover them whenever he can trace them as distinct from those of the factor, into whosoever hands they may come, except a *bona fide* purchaser for value. . . . " If the goods cannot be had their proceeds may be recovered.

As said in section 2030 of the Civil Code, *supra,* the factor cannot relieve himself of responsibility for the remittance of the proceeds of a sale made by him without the consent of his principal. [3] The relation of principal and factor is of a fiduciary character and carries with it the elements of a trust, requiring the factor to scrupulously account to his principal. (25 C. J. 342, sec. 5 et seq.) [4] A factor is both a bailee and a sales agent and is bound by his contract with his principal. (*Blackorby* v. *Friend,* 134 Minn. 1 [Ann. Cas. 1918E, 1199, 158 N. W. 708]; *Cordell* v. *Hall,* 34 Fed. 866; *Hall* v. *Cordell,* 142 U. S. 116 [35 L. Ed. 956,

12 Sup. Ct. Rep. 154].)  Nor can a factor set up an adverse claim to the property or to its proceeds as against his principal.  (See cases cited; also, *Britton* v. *Ferrin,* 171 N. Y. 235 [63 N. E. 954].)  **[5]** Likewise, the principal can follow the funds or property delivered to a factor to sell as against anyone having notice.  (*Keys Com. Co.* v. *Beatty,* 42 Okl. 721 [142 Pac. 1102] ; *Cable* v. *Iowa State Sav. Bank,* 197 Iowa, 393 [31 A. L. R. 748, 194 N. W. 957, 197 N. W. 434].) Likewise, if an owner of goods who is indebted to a bank for advances for the purchase price causes the goods to be shipped to his factor under an agreement between the owner and the bank, of which the factor has knowledge, that the proceeds are to be applied to payment of the bank's advances, the factor receiving the goods with knowledge of that understanding is bound to act accordingly; and until the bank is paid cannot apply any of the proceeds toward prior obligations of the owner to the factor.  (*Citizens Bank* v. *Adams,* 84 Fed. 268; *Cordell* v. *Hall,* 34 Fed. 866.)

In support of its second assignment of error, appellant cites the case of *Treadwell* v. *Davis,* 34 Cal. 601 [94 Am. Dec. 770], to the point that a pledgee parting with possession of the pledge loses his lien.  This case, however, while so holding, goes further and approves the principle that when the proceeds of the pledged property are redelivered, the lien reattaches thereto.  It appears from the Davis case that when Templeton, having a lien evidenced by warehouse receipts, transferred the warehouse receipts to the plaintiff, retaining, however, his debt against Thompson, the pledgor, the transfer of the warehouse receipts was made to the plaintiff under an agreement that the plaintiff should hold the same as security for his own debt and also under an agreement to pay Templeton, the agreement being with the knowledge and consent of the owner or pledgor, as subsequently ratified by him.  The court, in considering the loss and re-establishment of the lien treated the question in this manner: ''After surrendering the receipts to the plaintiff, and taking from him a written guaranty of the debt, he lost his lien on the goods.  But did the plaintiff acquire a new lien, not only for the security of his own debt, but as an indemnity against the liability which he incurred to Templeton? This must depend upon the fact whether Thompson consented to the transaction when it was made,

or ratified it afterward.   Nothing could be plainer than that
the plaintiff acquired a valid lien, provided it was mutually
agreed between himself, Templeton and Thompson that the
plaintiff should guaranty the debt to Thompson, and should
hold the goods for his indemnity and as a security for his
own debt.'' It was then held that the lien attached to the
proceeds and plaintiff was entitled to recover the whole sum
thereof.   In the case at bar, all the parties connected with
the transaction, including Burns, the original consignor,
were cognizant of and consented to the arrangements herein-
before referred to relative to the disposal of the cargo of
copra and the application of the proceeds thereof.   Refer-
ring again to 35 C. J., page 370, section 58, we find: ''Unless
there is an agreement express or implied giving the factor
the right to appropriate the proceeds of a sale to his own
use and subject to the lien of the factor for commissions,
advances, etc., the proceeds of goods sold by him belong to
the principal and the factor is liable and bound to account
to him therefor,'' and, further, ''If the factor has agreed to
apply the proceeds in a particular manner, it is his duty so
to do,'' and, as stated in the section referred to, this applies
to drafts drawn in favor of third persons and bills of ex-
change evidencing the proceeds.

[6]   Assignment of error No. 3 that the plaintiff lost its
lien, if any, to the cargo of copra and the proceeds, by
reason of the sale thereof, is so closely connected with as-
signment No. 2 that the authorities which we have cited are
about to consider determine the holding which should be
had concerning both of them.   As supporting assignment
No. 3, appellant cites the case of *Maier* v. *Freeman*, 112 Cal.
8 [53 Am. St. Rep. 151, 44 Pac. 357].   The facts, however,
in that case show it to be distinguishable from the one at
bar.   In the Maier case, the mortgagee of sheep under a
chattel mortgage authorized the mortgagor to make sale of
the sheep, the mortgagor agreeing to deposit the proceeds
in the bank to the credit of the mortgagee.   It was held
that the lien upon the sheep was extinguished by the sale
and was not transferred to the proceeds in the hands of
the mortgagor, but such proceeds were the property of the
mortgagor until collected and paid over to the mortgagee
and, therefore, subject to attachment.   Had the cargo of
copra in this case been turned over to Burns and Burns

had made sale thereof, then, and in that case, the unpaid proceeds in the possession of the purchaser from Burns would have been subject to attachment. We have, however, this state of circumstances: The merchandise was turned over to a factor for sale by the New Zealand Bank acting through the Canadian Bank, the proceeds collected by the factor in the way of a check and delivered to the Canadian Bank in the form of a check or bill of exchange and thus the proceeds were in the possession of plaintiff through its agent at the time of the service of the garnishment process. The contention of appellant in this particular is explicitly answered by the supreme court of this state in the case of *McIntyre* v. *Hauser*, 131 Cal. 11 [63 Pac. 69, 70]. There a certain James Brown owned a herd of cattle upon which third parties held a chattel mortgage. Brown sold these cattle to the defendant, the sale being evidenced by a contract in writing. To this contract was appended a written statement to the effect that the cattle were mortgaged to these third parties (naming them) to secure the payment of an indebtedness owing to them by Brown, and it was further stated by the complaint that they approved and consented to such sale provided the money derived therefrom was paid to them, the mortgagees. After the sale and before the money was actually paid over, the plaintiff as a creditor of Brown, garnisheed the money in the hands of Hauser. It was held that the garnishment was ineffective and the mortgagees were entitled to the money. In so holding, the court said: "There is no question in this case as to the lien of the mortgages attaching to the proceeds of the sale of the cattle. Neither is the conclusion to which we have arrived opposed to the decision in *Maier* v. *Freeman*, 112 Cal. 8 [53 Am. St. Rep. 151, 44 Pac. 357]. The facts of the two cases are widely variant. In that case the sheep had not been sold at the time the agreement between the mortgagor and mortgagee was made; and, in addition to that important fact, there, the mortgagor was to receive the proceeds of the sale of the sheep. Here neither of these controlling circumstances is presented. In order to constitute an equitable assignment of a debt, no express words to that effect are necessary." Burns was not to receive the proceeds of the sale of the copra; he was not handling or making the sale. The sale was made by a factor recognizing the title

of the plaintiff, and under the agreement to turn over the proceeds to the plaintiff's agent, the Canadian Bank.   The McIntyre case was affirmed in the case of *Williams* v. *Corker,* 144 Cal. 468 [77 Pac. 1004], where the circumstances were similar to the facts of the instant case and the inapplicability of the case of *Maier* v. *Freeman* was pointed out.   In the principal case cited by the appellant, to wit, *Utah-Idaho Live Stock L. Co.* v. *Blackfoot,* 290 Fed. 588, in support of assignment No. 3, the court, after setting forth many cases where mortgagees have surrendered their liens, makes the following observations: ''It is not intended to suggest that the plaintiff could not have made an agreement with Robinson that he should receive the proceeds of the sale and hold the same for plaintiff, or that such an agreement would not have been valid against attaching creditors or against the defendant bank, with the notice it had before it applied the credit to the payment of the notes. But any finding that consent to the sale was coupled with a condition that the money should become the plaintiff's property or should be subject to the lien of its mortgage, and that Robinson was to be its agent or trustee to receive and pay the money over to the plaintiff, would have to rest upon nothing more substantial than surmise and conjecture.'' This language shows that there was no agreement in that case, as there is in this, that the proceeds were to be delivered or that the plaintiff was to receive the same in payment of the debt which it held against the mortgagor. It does not appear in the written instrument which we have hereinbefore set forth that there was in so many words a statement that the lien of the plaintiff on the copra should attach to the proceeds, but, as we have here shown, it is not necessary to use any particular form of words to evidence such an intention or purpose.   When the bill of lading and other papers necessary to be turned over to the factor to transmit title to the purchaser from the factor upon the written agreement that the proceeds thereof were to be paid by the factor to the Canadian Bank, the agent of the plaintiff, it evidenced a purpose that the lien should reattach to the proceeds just as clearly and distinctly as if the writing had contained words such as ''it is hereby understood and agreed that the lien of the plaintiff on the cargo shall attach to the proceeds when paid over by Wills, the

factor, to the Canadian Bank, the agent of the plaintiff.''
All the parties to the transaction knew and understood that
the proceeds arising from the sale of the cargo of copra
were to be and were paid over to the Canadian Bank for
the uses and purposes and benefit of the plaintiff. The
memorandum or writing by Wills upon the bill of exchange
or draft to the effect that it was the proceeds of the ship-
ment of copra made by Burns was ineffective to change the
true intent and purpose of the transaction and the payment
over of the proceeds, and the trial court was correct in dis-
regarding any such patent attempt to lay the foundation
for the service of a writ of attachment or garnishee process,
under the claim that the ownership of the proceeds vested
in Burns.

[7] Appellant's fourth assignment of error that the bill
of exchange was taken by the New Zealand Bank from
Burns for collection only is based, apparently, upon the as-
sertion that the weight of the testimony is contrary to the
findings of the court. The law seems to be well-settled that
if a check or bill of exchange is taken for collection only
by a bank, the bank does not take title, but acts merely as
a collection agent and that the property in the check or
draft remains in the depositary and that the relation aris-
ing from the transaction is not that of debtor and creditor
but that of principal and agent. (3 R. C. L. 633.) It
is sufficient to say that the record discloses sufficient testi-
mony, if believed by the trial court, to warrant the holding
that the New Zealand Bank discounted the draft drawn by
Burns, and the fact that it was sent to its agent, the
Canadian Bank in San Francisco, for collection does not
contravene the statement of witness that the check was dis-
counted. It would only go to the effect that the Canadian
Bank did not rediscount the draft, but simply accepted the
same and acted therein in relation thereto as the collection
agent of its principal, the National Bank of New Zealand.
Under this state of the record, we do not deem it necessary
to extend the length of this opinion by quoting the testi-
mony bearing upon this assignment set forth in the respond-
ent's brief, in support of the findings of the trial court.

[8] Assignments 5 and 6 will be considered together:
That no third-party claim was served and that the third-
party claim, as served, did not comply with section 689 of

the Code of Civil Procedure. That no third-party claim was served is based upon the fact that the third-party claim, as amended, was not served until after the sheriff had made return on the writ of garnishment. Section 689 of the Code of Civil Procedure specifies that if the property levied on is claimed by a third person by a written claim verified by his oath, or that of his agent, and is served upon the sheriff, the sheriff is not bound to keep the property unless the plaintiff, or the person in whose favor the writ of execution runs, on demand, indemnifies the sheriff against such claim by an undertaking, etc.

There is nothing in the section requiring that the third-party claim be served at any particular period of time after the attachment or garnishment, from which it would seem to follow that such claim may be made at any time before the sheriff has converted the property by sale, or by other means has subjected it to the satisfaction of the plaintiff's demands. That is, the third party will not be allowed to sleep upon his rights until the sheriff has placed himself in a position where it is impossible for him to deliver the property to the third-party claimant or obtain an indemnity bond from the attaching creditor saving him harmless from the claims of third parties. The fact that the check was turned over after the sheriff made return upon the attachment does not release the attachment or garnishment. In the case at bar the sheriff acted upon the third-party claim and demanded and obtained from the attaching creditor a bond of indemnity. This court has held in the case of *Brinkley-Douglas F. Co.* v. *Silman,* 33 Cal. App. 643 [166 Pac. 371], that when the sheriff does not object to the sufficiency of the notice and claim of the third party, but demands of the creditor that an indemnity bond be given and an undertaking is given without objection on the part of the creditor, the sheriff waives any question as to the sufficiency of the notice or demand, citing *Dubois* v. *Spink,* 114 Cal. 289 [46 Pac. 95]; *Kellogg* v. *Burr,* 126 Cal. 38 [58 Pac. 306]. No objection was made by the defendant in this case either to the sufficiency of the notice or of the claim made by the third party. No objection was made by the creditor and the sheriff obtained his bond of indemnity. Whether the bond is or is not a nullity is not a matter that can be determined in this action, nor is it a question which can in

anywise affect the determination of this cause. Section 689 of the Code of Civil Procedure has been so amended since some of the decisions based thereon have been rendered as to make statements therein inapplicable touching the question of the sufficiency of the third-party claim relative to a statement of the title upon which the claim of the third party is founded. All that needs to be set forth now is the right to the possession of the property in question, which follows as a necessary consequence of a statement of the ownership by the third party of the attached or garnished property, nothing to the contrary appearing, because the right to possession follows the statement of ownership. The trial court having upon sufficient evidence found that the notice to the sheriff stated that the plaintiff was the owner and entitled to possession of the $17,888.48, represented by the check, and that demand was made for the release of the check and the moneys represented thereby, it may here be further said that the record shows that the demand and notice were made and served prior to the time of the subjection of the check or the proceeds in payment of the judgment held by Wills in his attachment suit. The answer of the defendant does not deny the service of a written claim verified by an agent of the plaintiff being made and served upon the defendant. It only denies that no further or other notice or affidavit was served upon the defendant other than as set forth in exhibit "A," attached to the defendant's amended answer. The notice thus referred to states, in substance, being addressed to the sheriff of the city and county of San Francisco, to wit: You are notified that certain moneys heretofore, to wit, on the sixteenth day of August, 1922, attached by you by service and deposit of a writ of attachment upon the Canadian Bank of Commerce, San Francisco, California, are claimed by the National Bank of New Zealand, Ltd. You are notified to order the release of said property and moneys to the National Bank of New Zealand; that the value of the same is $17,888.48. The affidavit is to the effect that the Bank of New Zealand is the owner and entitled to the possession of $17,888.48, represented by the check drawn by respondent Wills, dated August 16, 1922, made payable in favor of the Canadian Bank of Commerce and drawn upon the British American Bank of San Francisco; that the moneys represented by the said

check have been garnisheed or attached by writ of attachment, etc., under an attachment requiring the defendant to attach the property of John Burns & Co., Ltd.; that John Burns & Co., Ltd., has no interest of any kind or character whatsoever in or to the said sum of money. This exhibit calls attention to the check in question, sufficiently identifies the same to put the sheriff upon notice, and while the claim to the check and the claim to the money, or the value thereof, may not be as clearly and distinctly segregated or specified as might be possible, yet we think the language is sufficiently definite to carry home to the sheriff the ownership and claim of the respondent and sufficient to entitle him to act thereon, and having acted thereon, without objection as to the sufficiency of the same, to put him upon notice and obtain an indemnity bond, as herein stated, we think the cases which we have cited now preclude the urging of the insufficiency thereof as a defense to this action. That a third party may intervene in the original action, as set forth in 5 California Jurisprudence, 184, section 19, is in no sense a bar to the maintenance by such third party of an action for conversion. Nor do the provisions of section 710½ to and including section 713½ of the Code of Civil Procedure estop the plaintiff in this action from maintaining an action sounding in trover. Our attention is called to the case of *Arena* v. *Bank of Italy*, 194 Cal. 195 [228 Pac. 441], as establishing the insufficiency of a third-party claim in this case and, therefore, the inability of the plaintiff to maintain this action. It is sufficient, however, to state that the facts in the Arena case are readily distinguishable from the circumstances which we have hereinbefore set forth. The Bank of Italy did not claim to be the owner of the property in question, but simply set forth the assignment of the property to the claimants, as security for the payment of a promissory note. The assignment showed on its face that it was not good as against creditors and the third-party claim founded thereon likewise exhibited the insufficiency of the claim. The property in question consisted of a number of barrels of olives, cases of tomato puree, tomato oil, etc. The facts set forth in the claim showed that the merchandise had been pledged to the bank to secure a certain indebtedness due to the bank; that the bank, pursuant to certain agreements between itself and the owner

of the merchandise had permitted him to take and have possession of said merchandise, to remove the same from the warehouse wherein the merchandise had been stored pursuant to the pledge, and to take the same to his own premises on Front Street in order to sell and dispose of the same; that the mortgagee or pledgee agreed to take the goods and hold the same for the benefit of the bank and sell the same for its account, etc. This case does not limit in any particular or overrule anything which is said in the McIntyre case, *supra,* or the case of *Williams* v. *Corker, supra,* nor does it purport to restrict the holding in *Kellogg* v. *Burr, Brinkley Douglas F. Co.* v. *Silman, supra.* It is more in line with the case of *Maier* v. *Freeman,* 112 Cal. 8 [53 Am. St. Rep. 151, 44 Pac. 357], holding that when the property comes into the possession of the mortgagor, it is subject to attachment. Thus the Arena case, upon its face, refutes the claim of the third party.

[9] As to the seventh assignment of error that the complaint did not sufficiently allege the services of a third-party claim, we may state that it is generally held to be sufficient to set forth the instrument according to the legal tenor or effect thereof. (21 Cal. Jur. 45; *Smith* v. *Jaccard,* 20 Cal. App. 280 [128 Pac. 1023, 1026]; *Zucco* v. *Farullo,* 37 Cal. App. 562 [174 Pac. 929].) But there is a further and sufficient reason why this assignment is untenable. The defendant sets forth the instrument *in haec verba,* states this was the kind of notice and claim served upon the defendant, and having supplied the alleged insufficiency in the complaint, no cause of objection now exists. (21 Cal. Jur. 278; *Kreling* v. *Kreling,* 118 Cal. 413 [50 Pac. 546].)

In support of the allegation that the findings are insufficient to support the judgment assigned as the eighth reason why reversal should be had herein, nothing further is set forth in the briefs than the questions which we have herein been considering, which we deem a sufficient answer to the eighth assignment without restatement.

[10] Finally, the appellant insists that the plaintiff, having neither title nor right to possession of the check, was not in a position to maintain this action. This position is assumed on the theory that the relation of debtor and creditor existed between the Canadian Bank and the New Zealand Bank and not one of principal and agent. In this

particular, we may call attention to the fact that the appellant, in his opening brief, strongly argues that the relation between the Canadian Bank and the respondent was that of principal and agent and that, therefore, the New Zealand Bank having voluntarily, through its agent, delivered the check to the defendant, could not maintain any action for the conversion of the check, or. of its proceeds, irrespective of the ownership of the property.    To show that what is here stated correctly indicates the theory of the case adopted by the appellant in the first instance, we quote the following from his opening brief: ''The relation between the respondent and the Canadian Bank was that of principal and agent.    As far as respondent is concerned, the Canadian Bank was merely acting as its agent for collection.    Such being the case, the Canadian Bank had no authority to accept anything but money from Wills.    Instead of money, the Canadian Bank accepted from Wills a check which it had certified.    This was not a completion of its agency to collect and not until completion of collection can it be said that the proceeds had come into the possession of the respondent.''    In support of this position appellant cites the cases of *Henderson* v. *O'Connell,* 106 Cal. 391 [39 Pac. 786]; *Luckehe* v. *First Nat. Bank,* 193 Cal. 184 [223 Pac. 547]. The latter case is cited to the effect that ''until the proceeds come into the possession of respondent it could obtain no lien thereon nor could it exercise any right of setoff.    The check never having been cashed, the act of agency of the Canadian Bank was never completed and hence the proceeds never came into the legal possession of respondent. No lien on the proceeds therefore was ever vested in respondent after the delivery of the check by Wills to the Canadian Bank, whether by virtue of a statute creating a general banker's lien or by virtue of any general letter of hypothecation.    Hence respondent never obtained any interest therein upon which it could predicate a third-party claim.''    This position assumed by the appellant is sufficiently ·answered by the California cases which we have heretofore cited in relation to the disposition of pledged property by the pledgee through a third person or factor with the understanding entered into by all parties interested that the proceeds of the pledged property should be turned over to the pledgee.    As if in answer to the argument pre-

sented in the opening brief, the reply brief of appellant sets forth that the relation between the Canadian Bank and the Bank of New Zealand was at all times that of debtor and creditor, that the Canadian Bank simply occupied the position of a debtor of the New Zealand Bank, was the absolute owner of the check, owing the New Zealand Bank, if anything, simply the money, the value of the check, and, therefore, the respondent possessed no title to any of the property in question enabling it to maintain this action.

We may here state the record shows that the Canadian Bank never cashed the check which it received and never deposited to the credit of the New Zealand Bank in its account any funds represented by the check. That in so far as any act is shown to have been taken or performed by the Canadian Bank in relation to charging itself either with the check or with any funds represented thereby, it assumed and acted only in the capacity of a collection agent, receiving property for the benefit of its principal. Appellant calls attention to section 1818 and section 1878 of the Civil Code. These sections, however, are inapplicable because they refer to the relation that arises between a depositor and depositary. In other words, had Wills been turning over his own property to the New Zealand Bank in the way of bills of exchange, or checks, as a customer ordinarily makes a deposit in the bank, then and in that case the sections would have full force and effect. The fact that the principal, the New Zealand Bank, had directed its collection agent, the Canadian Bank, to transmit the proceeds of the sale of the copra to what appears to be the parent bank with which the plaintiff was and is connected, does not alter the relationship existing at the date of the levy of the garnishment referred to herein. Again, if the relation of debtor and creditor *eo instanti* arose between the Canadian Bank and the Bank of New Zealand, when Wills handed the check or bill of exchange representing the proceeds of the cargo of copra to the Canadian Bank, then and in that case there was nothing in the possession of the Canadian Bank belonging to Burns and the conclusion is inescapable that the defendant has converted property and applied property not belonging to Burns to the uses and purposes of Wills in his attachment suit against Burns.

This, however, would not entitle the respondent to maintain this action unless it had the ownership therein. We think the facts in this case distinguish it from the principal cases relied upon by the appellant in support of its second assumed position, to wit: *Midway etc. Co.* v. *Citizens' Nat. Bank,* 25 Cal. App. 366 [143 Pac. 800], and *Plumas County Bank* v. *Rideout,* 165 Cal. 126 [47 L. R. A. (N. S.) 552, 131 Pac. 360]. In both of these cases the transactions establish that the relationship of debtor and creditor had been established, the record kept by the parties interested showing clearly that such was the case and that the usual course of banking in the handling of the checks and transferring funds giving rise to that relation, had been followed. In the case at bar the Canadian Bank had never assumed the relation of debtor to the respondent nor had the respondent by any of its acts ever charged the Canadian Bank as a debtor upon its books, but had all the time treated it as a principal would treat an agent, save and except that it was dealing with a corporate entity designated a bank instead of with an individual. This sufficiently appears by the written testimony in this case hereinbefore set forth. In this particular the language of the learned trial judge appears to us most pertinent: "As an evidence of the specific amount of this indebtedness and as conditional payment thereof, Wills & Sons issued its check drawn on its banker, or in other words issued an order on a banking institution which owed Wills & Sons the amount of the check. The receipt of the check by the Canadian Bank did not of itself discharge the original indebtedness for which the check was issued. That indebtedness remained until the check should be honored or in some way accepted in discharge of the obligation. (*Comptoir D'Escompte* v. *Dresbach,* 78 Cal. 15 [20 Pac. 28]; *Utah Const. Co.* v. *Western Pacific R. Co.,* 174 Cal. 156, 166, 167 [162 Pac. 631]; *South S. F. P. & P. Co.* v. *Jacobsen,* 183 Cal. 131, 134 [190 Pac. 628]; *Light* v. *Stevens,* 8 Cal. App. 74, 77 [103 Pac. 361]; *Goodman* v. *Williamson,* 45 Cal. 664, 666 [188 Pac. 291].) Hence, delivery of the check did not at the time extinguish the obligation between Wills & Sons and the National Bank of New Zealand. Nor could Wills & Sons, by inscribing any memorandum on the check, transfer the ownership of the credit

from the National Bank of New Zealand to John Burns & Co.''

The check, though payable to, and placed in the possession of, the Canadian Bank of Commerce, represented a liquidated claim of the National Bank of New Zealand against Wills & Sons. And when Wills & Sons attached the check or the credit represented thereby, the status of affairs was little different from what it would have been if Wills & Sons had assigned to someone for collection its claim against Burns & Co., and then had had that assignee attach, as property of Burns & Co., the net proceeds of the sale of the copra in the hands of Wills & Sons really owing to the National Bank of New Zealand.

The Canadian Bank represented the National Bank of New Zealand as an agent to collect the indebtedness; and the mere fact that the Canadian Bank received, and at the time of the levy held, a check as conditional payment cannot alter the ownership of the National Bank of New Zealand in the credit represented by the check, or prevent that bank, as the real beneficial owner, from having recourse to an action of conversion to recover the value of its property.

As was said by Lord Ellenborough in *Stephens* v. *Elwall,* 4 Maule & S. (Eng.) 259, ''a person is guilty of conversion who intermeddles with my property and disposes of it; and it is no answer that he acted under the authority of another who had himself no authority to dispose of it.''

Agreeing with appellant, as set forth in his opening brief, that the Canadian Bank at the time of its reception from Wills of the check or bill of exchange representing the proceeds of the cargo of copra guaranteed by Wills to be turned over pursuant to the direction of the New Zealand Bank, through its representative, the Canadian Bank, is correct, and that all the circumstances supported this conclusion, it is only necessary to cite a few authorities to confirm the rights of respondent to maintain this action. In section 19, page 1043, of volume 24 Cal. Jur., the text-writer sets forth the general rule as to the right to maintain trover in the following language: ''To enable one to recover for the conversion of personal property, he must have had a general or special ownership of the property at the time of the tort. Legal title is not necessary; any special valuable interest in the property accompanied with the right of possession is

sufficient. Actual possession of a chattel at the time of its conversion will sustain trover, except as to the true owner or one claiming under him, even though the title be conceded to be in a third person. So also one who has a present right to possession may maintain the action. Manifestly, however, one cannot maintain the action where he had neither possession, right of possession, nor any title in the property claimed at the time of the conversion.''

In 28 Am. & Eng. Ency. of Law, page 661, second edition, we find the following: ''An agent may be guilty of the conversion of chattels intrusted to him by his principal so as to render him liable in trover to the principal, or the action may be maintained by the principal against third persons who wrongfully acquire the property from the agent. Unless the principal is entitled to possession of the chattels as against the agent he cannot, of course, as against the latter, maintain trover therefor; but a wrongdoer who takes the chattels from a factor cannot set up the lien of the factor in defense to an action of trover against him by the principal.''

There is also another principle which applies to this proceeding and gives the respondent a right of action. The fact that the check or bill of exchange was not applied by the Canadian Bank to the uses and purposes of the respondent as theretofore directed. This principle is stated in section 440 of the Law of Conversion by Bowers, to wit: ''From the cases cited it is gathered that a general owner of a chattel cannot maintain trover therefor during the continuance of a definite term for which he has parted with possession; but where a bailee, during the term of the bailment, has put the chattel to a different use from that for which it was bailed, the owner thereupon becomes entitled to immediate possession . . . and may maintain trover for its conversion.'' [11] The control of the Canadian Bank, as the agent of the respondent and the special property of the Canadian Bank, if any, in and to the check or bill of exchange was for the express purpose of applying the proceeds of the sale of the copra to the discharge of the indebtedness of Burns to the New Zealand Bank, evidenced and created by the bill of exchange theretofore discounted by the New Zealand Bank at the inception of the transaction out of which this controversy arises, and when the check or bill

of ·exchange evidencing the proceeds arising from the sale of the cargo of copra was placed in the possession of the defendant it was in contravention of the rights of the respondent and gave rise to an immediate cause of action on the part of the plaintiff herein. That the Canadian Bank may have rendered itself liable by turning the check or bill of exchange over to the defendant does not militate against either the ownership of the proceeds of the sale of the copra, or the right of the respondent to maintain this action. As to the cargo of copra, the rule is clear that the pledgee, to wit, the respondent, if considered only as a pledgee, has the right to maintain trover for the conversion thereof. (Bowers on the Law of Conversion, secs. 392, 393.) The latter section deals with the right of the pledgee to maintain trover against third persons. While there are some cases to the contrary, notably the case of *Herring* v. *Tilghman*, 35 N. C. 364, holding to the contrary, the weight of authority supports the rule set forth in 28 Am. & Eng. Ency. of Law, second edition, 656, to wit: "The owner of evidences of indebtedness, such as bills, notes, bonds, etc., may maintain trover in his own name for their conversion though he could not have maintained in his name an action on the instrument itself. *Donnell* v. *Thompson*, 13 Ala. 440; *Lowremore* v. *Berry*, 19 Ala. 130 [54 Am. Dec. 188]; *Clowes* v. *Hawley*, 12 Johns. (N. Y.) 486." The text-writer in 28 Am. & Eng. Ency. of Law, 656, *supra*, further states: "The owner of a note may maintain trover therefor though there had been no indorsement of the note to him." Likewise, "in trover for check sent by the debtor to his creditor and wrongfully converted by a third person, it is no defense that the check was not received by the plaintiff in absolute payment of his indebtedness." Thus, even though the check or bill of exchange delivered by Wills to the Canadian Bank was not absolutely payment *pro tanto* of the indebtedness of Burns to the respondent, the right of the plaintiff to maintain trover therefor existed. The cases are almost legion on the subject of the right to maintain trover by one having either an absolute, a general, or a special property in the property converted, and it would serve no useful purpose to review any considerable number of the authorities bearing upon this question cited by counsel in this cause. If it be admitted that the Canadian Bank was the agent of the New Zealand

Bank in the transactions which we have detailed, and which we think must be admitted, the weight of authority is overwhelmingly in favor of the maintenance of this cause by the respondent as the principal having a general ownership in the proceeds of the sale of the cargo of copra. As we have shown, the form in which such proceeds are evidenced is immaterial as to the ownership and ultimate right of possession. We conclude that the plaintiff in this action was and is the real party in interest. The judgment of the trial court is affirmed.

Buck, J., *pro tem.*, and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 15, 1927.