[Civ. No. 1248. Fourth Appellate District.—June 19, 1934.]

CALIFORNIA RAISIN POOL (a Corporation), Respondent, v. MIKE BALIAN et al., Appellants.

Glenn L. Moran and Russell & Heid for Appellants.

Feemster, Perkins & McCormick and Sutherland, Dearing & Jertberg for Respondent.

HAINES, J., *pro tem.*—Defendant and appellant Mike Balian, in 1924, bought for $3,000, on a contract providing for installment payments from one Smith, 40 acres of vineyard property in Tulare County. Smith's rights as vendor under the contract were subsequently acquired by the Bank of Italy National Trust & Savings Association. In 1927 Balian bought directly from the Bank of Italy National Trust & Savings Association for $8,244.48 a further 20 acres of vineyard in the same county, also on a contract providing for installment payments. The two contracts followed the same form and each authorized the vendor in the event of the vendee's default in any of its terms or conditions to re-enter the premises and remove all persons therefrom if such default should continue for a period of 10 days. There was embodied in each contract a crop mortgage by which the vendee mortgaged to the vendor all crops to be grown on the premises during the life of the contract and among the provisions of such mortgage was in each case the following:

"Said party of the second part agrees that he will properly and in a husbandlike manner attend to, care for, and protect said crop or crops until the same shall be ready for harvesting, and then harvest and prepare the same for market, and when so prepared to deliver the marketable

product to said party of the first part to be by it sold and disposed of at the then market price, and the proceeds of said sale shall be applied by said party of the first part to the payment of the debt hereby secured according to the terms of this agreement and mortgage, with interest according to the terms of said agreement and mortgage, together with any sums paid or charges incurred by said party of the first part in making said sale or any provisions thereof, and any surplus of said proceeds remaining shall be paid to said party of the second part.''

Balian took possession under these contracts of the respective properties and continued to farm the same until the contracts were foreclosed as hereinafter stated and on June 16, 1930, entered into an agreement with plaintiff and respondent California Raisin Pool, a corporation, providing for his delivery to it of all raisins grown or matured on both properties. While Balian continued in possession of the two properties under his contracts for the purchase of the same there were, pursuant to his agreement with the California Raisin Pool, from time to time delivered to it raisins aggregating in amount about 48 tons, which was the 1930 crop. There is a dispute as to whether the deliveries were made by Balian direct. One Nielsen, the bank's assistant manager, testified that what the bank did with Balian's 1930 crop was to hire its own trucks and with them pick up the raisins and itself make delivery of them to the Raisin Pool and get the weight tags for them and turn them in to its collection department for collection of the amounts payable thereon. The testimony of one Brown, secretary of respondent Raisin Pool, however, incidentally refers to the 1930 crop of raisins as having been delivered by Balian, and the evidence shows that the Raisin Pool kept the account for the same in Balian's name, in addition to which Balian, on being asked: ''Were all the raisins *you delivered* to the Pool produced upon this property you were buying from the Bank of Italy or Bank of America?'' answered ''Yes.'' For these deliveries the Raisin Pool from time to time drew its checks in Balian's favor to correspond with the weight tags and sent them to the Visalia branch of the Bank of Italy National Trust & Savings Association, where it was Balian's practice to indorse and deliver them to the bank to apply on the sums which he owed it. Not

only was he indebted to the bank under his said contracts and crop mortgages for the unpaid portions of the purchase price of the land with the interest accruing thereon but, in addition, the bank each month loaned him moneys to meet his living and ranch expenses and under the terms of the crop mortgage the repayment of such advances was also to be secured thereby. Balian having been for some years seriously in default on his contracts, the bank at the end of the year 1930 foreclosed both contracts and took possession of both parcels of land and in the spring of 1931 turned the same over to its land department to operate. The land department employed Balian to farm the property on a salary and this he continued to do on the bank's behalf for a long time thereafter. On November 2, 1931, a written agreement was executed between Balian and his wife (as well as a former wife) as first parties, and Bank of America National Trust & Savings Association as successor to Bank of Italy National Trust & Savings Association as party of the second part, whereby Balian et al. quitclaimed both parcels of land to the bank and it was provided that "by mutual consent of the parties thereto and hereto the following two agreements of sale and crop mortgages are hereby canceled, annulled and terminated", after which follows the description of the two original contracts and crop mortgages. This agreement of November 2, 1931, continues as follows:

"Third: The said first parties hereby acknowledge, certify and declare that all matters, claims and accounts between them and the said second party herein have been fully settled, and they have not nor has either of them, any claim or demand whatsoever against the said second party or its predecessor in interest, or any of them, arising out of or based upon said two agreements of sale and crop mortgages mentioned aforesaid, or either of them, or arising out of or based upon any other fact or circumstance whatsoever and said first parties hereby fully release said second party and its said predecessors in interest from any and all claim, demand or liability whatsoever from the beginning of the world to the date hereof. Said second party hereby acknowledges, certifies and declares that all matters, claims and amounts between it and the said first parties have been fully settled and satisfied and said second party has no

claim or demand whatsoever of any kind against said first parties or either of them, and said second party hereby fully and forever releases and discharges the said first parties and each of them from any and all claim and demand from the beginning of the world to the date hereof.''

At the time this last agreement was made respondent California Raisin Pool had not completed its settlement payments for the 1930 crop of raisins delivered to it, but about a month later, that is on December 3, 1931, it issued a check negotiable in form for the final payment on the 1930 crop drawn on any bank in Fresno, California, and payable to Balian's order, for $520.76 and mailed the same to Balian with a statement made out in his name of the 1930 deliveries which showed the check to be in the amount due to complete the settlement therefor. This check Balian received in due course of mail. At that time there appears still to have been a sum of $942.42, part of which had been advanced to Balian by the commercial department of the bank, presumably for living expenses, during 1931, but some of which, according to the testimony, represented advances made by that department to him at previous times which had never been actually repaid to the bank and which Balian would still have owed to it had not this indebtedness been included in that wiped out by the agreement of November 2, 1931.

Balian had on May 4, 1931, executed, in consideration of money loaned, his promissory note to defendant and appellant Dames for $575, and on December 7, 1931, showed Dames the check just received from the Raisin Pool and at Dames' request indorsed the same and turned it over to Dames, who credited its amount on the note to him and handed the check to one Belshaw, who cashed it, Dames eventually receiving the proceeds. Something like three days later both respondent California Raisin Pool and the Bank of America National Trust & Savings Association sent representatives to both appellants Balian and Dames, demanding the return of the check on the theory that it had been issued and sent to Balian by mistake, whereas it should have been issued and sent to the bank. Balian and Dames having both refused the demand, the Raisin Pool brought the present action to recover the amount paid by means of the check and obtained judgment against both

348

Balian and Dames therefor, from which the present appeal is taken.

 It is undoubted law that a vendor having elected to forfeit and terminate a vendee's rights, under a contract for the sale and purchase of real estate, cannot thereafter recover the unpaid installments of the purchase price, since by virtue of the termination of the contract these cease to be enforceable obligations. ᐧ (*Glassell* v. *Coleman*, 94 Cal. 260 [29 Pac. 508]; *Dishian* v. *Kishishian*, 64 Cal. App. 440 [221 Pac. 669]; *Hovsepian* v. *Eskender*, 69 Cal. App. 379 [231 Pac. 364]; *Yakoobian* v. *Johnson*, 102 Cal. App. 10 [282 Pac. 522].) So far as Balian's indebtedness represented the purchase price of the land or any interest thereon, it is apparent that after the contract was terminated he was no more obligated to deliver *in futuro* raisins that he had severed from the ground while the contract was in force than he was to make *in futuro* payments that had accrued under it while it was in force. The stipulation for delivery of the raisins amounted merely to a stipulation for making payments in that form. In *Hovespian* v. *Eskender, supra,* where a contract of sale of land which the vendor had elected to terminate for the vendee's default provided for delivery of the crops in the joint names of vendor and vendee and that 60 per cent of their proceeds should apply on the payments to be made under the contract to the vendor, the court said of the vendor (p. 383): "However, by her notice of cancellation and subsequent proceedings she canceled that instrument. She may not now assert any claim to a share of the crop resting the same on the provisions of that instrument (*Glassell* v. *Coleman*, 94 Cal. 260, 266 [29 Pac. 508]). If, instead of the 60 per cent mentioned as a share of the crop the contract had provided for a cash payment, then it is clear that she would not be entitled to the cash payment. (*Glassell* v. *Coleman, supra;* . . . *Dishian* v. *Kishishian*, 64 Cal. App. 440 [221 Pac. 669].) The rule remains the same when the payment provided in the contract was expressed as a portion of the crop instead of being expressed as so much money."

Respondent claims, however, that these principles are inapplicable to its situation for the reason that not only did the crop mortgages here require Balian to deliver his crops to the bank which was to market them and apply the

proceeds on his indebtedness to it but also because the bank had in pursuance thereof actually taken possession, as it asserts, of the raisins here involved and delivered them to respondent. As we noticed, this claim that the bank took possession of the 1930 crop and itself made the deliveries to respondent rests on Nielsen's testimony to that effect. Appellant claims that Nielsen admitted that his connection with the Visalia branch of the bank began later and therefore that his testimony on the subject is mere hearsay or a conclusion. The trial, however, occurred in February of 1932, and his testimony was that he had then been connected with the bank at Visalia for three years, which would indicate that he must have been there through all of the year 1930, and while there is some confusion in the transcript on the subject, a careful reading of the record shows that a statement made by him that what occurred preceded his time there applied to the making of the contracts and chattel mortgages, not to the handling of the 1930 crops. We must presume, in support of the judgment, that the trial court believed his testimony that the bank had obtained possession of the 1930 crops while the contract was in force and in pursuance of its provisions, from which it would follow that an equitable assignment to the bank of the right to receive the proceeds from respondent had already been, as of that time, accomplished (*McIntyre* v. *Hauser*, 131 Cal. 11 [63 Pac. 69]; *Williams* v. *Corker*, 144 Cal. 468 [77 Pac. 1004]; *National Bank of New Zealand* v. *Finn*, 81 Cal. App. 317 [253 Pac. 757]). It may be added that the evidence shows that even had the entire proceeds of the 1930 raisin crop been paid to the bank, the same would not have sufficed to repay the advances made by it to Balian for living and ranch expenses but would have fallen short thereof by $42.89 and left nothing from that year's crop to apply on the purchase price of the land or the interest thereon and that respondent claims that, even if the termination of the contracts had destroyed the bank's right to any further payments on the land from the proceeds of the crops, its effect was not to terminate the provisions of the contracts and crop mortgages affording the bank security upon the crops for its advances. Whether, in view of the broad terms of the release contained in the agreement of November 2, 1931, any such claim would be

tenable we need not decide, since we must treat it as settled that the bank had already become fully entitled to the proceeds of the 1930 crop in that year.

It remains to mention Dames' claim to have been an innocent purchaser for value of the $520.76 check without notice of any right of the bank to it. That Dames was a purchaser for value cannot be doubted since an "antecedent or pre-existing debt" amounts to "value" (Civ. Code, sec. 3106)· and the testimony is undisputed that Balian was indebted to him and that the amount of the check was credited on the debt. It must be conceded that the affirmative showing in the present record to the effect that Dames, when he took the check and obtained the money on it, was aware of the bank's rights, is somewhat tenuous. However, under section 3140 of the Civil Code, once it was shown that Balian had no right to the check it was Dames' burden to prove that he acquired it without notice of any infirmity in Balian's title and we cannot say that the evidence is such that the trial court was bound to find that to be the fact.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 16, 1934.